UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| **AIG SPECIALTY INSURANCE COMPANY,** <br><br> **Plaintiff,** <br><br> v. <br><br> **THERMO FISHER SCIENTIFIC, INC.,** *et al.*, <br><br> **Defendants.** | Case No. 20–cv–13046–CCC–ESK <br><br><br> OPINION |

**KIEL**, **U.S.M.J.**

**THIS MATTER** is before the Court on plaintiff AIG Specialty Insurance Company's application to sever and stay defendants Thermo Fisher Scientific Inc. and Fisher Scientific Company L.L.C.'s (collectively, Fisher Entities) [1] counterclaim for bad faith (Application). (ECF No. 40.) The Fisher Entities filed an opposition (ECF No. 43), AIG filed a reply in further support of the Application (ECF No. 47), and the Fisher Entities filed a sur-reply in further opposition to the Application (ECF No. 49). A hearing on the Application and related submissions was held on March 15, 2021 (ECF No. 51), and the parties thereafter filed supplemental letters (ECF Nos. 52, 53). For the following reasons, the Application is **GRANTED**.

## BACKGROUND

This matter is an insurance coverage dispute. (ECF Nos. 32, 37.) In the first amended complaint, AIG disputes the Fisher Entities' claimed entitlement

---

[1] According to the amended complaint, "[t]hrough a 2006 merger by and between Thermo Electron Corporation and Fisher Scientific's parent company, [defendant] Fisher Scientific operates as a wholly-owned subsidiary of Fisher Scientific International LLC, which is wholly owned by [defendant] Thermo Fisher." (ECF No. 32 ¶ 17.)

to "insurance coverage under an [AIG] policy to address contamination of groundwater" in the Westmoreland Well Field (Well Field), which supplies drinking water to the Borough of Fair Lawn, New Jersey (Borough). (ECF No. 32 ¶ 1.) The Fisher Entities' facility (Facility), located near the Well Field (*id.* ¶ 25), has been the subject of environmental investigation and remediation for several decades. (*Id.* pp. 5–15; ECF No. 37 pp. 21–31; ECF No. 40 p. 1.) Under a Consent Order with the United States Environmental Protection Agency (Agency), Fisher Scientific Company L.L.C. (Fisher Scientific) agreed to undertake remediation and upgrade the Borough's water treatment plant at a net present cost of $19,500,000 (Remediation Costs).[2] (ECF No. 32 ¶¶ 1, 44–49; ECF No. 40 p. 1.)

AIG seeks to disclaim coverage for the Remediation Costs under an insurance agreement issued to the Fisher Entities (Policy). (ECF No. 32 ¶ 1.) Conversely, the Fisher Entities seek coverage under the Policy for the Remediation Costs. (ECF No. 37 p. 19 ¶ 3.) The Policy, bearing policy number PLS 11057730, incepted on February 1, 2016 and expired on February 1, 2019. (*Id.* ¶ 53.) The Fisher Entities submitted to AIG a notice of claim as to the Remediation Costs on January 31, 2019. (*Id.* ¶ 69.) The Facility is an "Insured Property" under Endorsement No. 1 of the Policy. (*Id.* ¶ 60.)

## I. AIG'S AMENDED COMPLAINT

AIG disputes coverage under the Policy on the following grounds: (1) the Fisher Entities failed to provide notice of the pollution conditions and claims "as soon as possible"; (2) the Fisher Entities failed to disclose the pollution conditions

---

[2] This figure is comprised of: (1) $5,215,000 for the construction of a 1,200 square-foot treatment facility to accommodate upgrades to the treatment system at the Well Field (ECF No. 37 ¶¶ 50, 51); and (2) $14,291,000 to finance operations and maintenance activities over a remediation period of 30 years (*id.* ¶ 52). The Fisher Entities also agreed to pay the Borough about $484,000 for its water replacement costs, and $13,000 per month pending completion of upgrades to the treatment facility. (*Id.* ¶¶ 50–52.)

in their insurance application to AIG[3]; (3) the Fisher Entities failed to cooperate with AIG in the investigation and defense of any claims against them, which deprived AIG of its right to control the defense of those claims; and (4) the Fisher Entities assumed obligations or made payments without AIG's consent.[4] (*Id.* ¶¶ 2, 3, 75.)

The amended complaint asserts causes of action for declaratory relief (count one), and rescission for equitable fraud (count two). (*Id.* pp. 25, 26.) As to count one, AIG seeks a declaration that it has no obligation to indemnify the Fisher Entities for the Remediation Costs and any associated third-party claims. (*Id.* p. 3 ¶ 5.) Alternatively, as to count two, AIG seeks a judgment for rescission of the Policy. (*Id.*)

## II. THE FISHER ENTITIES' ANSWER AND FIRST AMENDED COUNTERCLAIM.

In their first amended counterclaim, the Fisher Entities contend the Remediation Costs are covered under the Policy. (ECF No. 37 p. 19 ¶ 3.) They also allege that AIG initially accepted coverage, then withdrew it one year later. (*Id.* p. 20 ¶ 5.) The Fisher Entities claim that this lawsuit is proceeding on "a now-abandoned coverage argument" and that AIG "filed this litigation without giving [the Fisher Entities] any meaningful opportunity to respond[.]" (*Id.* ¶ 6.) Purportedly, AIG's conduct amounts to a "wrongful handling of [their] claims[.]" (*Id.* ¶ 7.) The Fisher Entities equate such conduct to bad faith.

The first amended counterclaim describes the content of certain letters exchanged between AIG and the Fisher Entities. Specifically, AIG issued letters

---

[3] AIG specifically alleges that the Fisher Entities were aware of detections of 1,4-dioxane and certain contaminants in the per- and polyfluoroalkyl substances family of chemicals, but failed to disclose the contaminants in their Policy application. (*Id.* ¶¶ 3–5.)

[4] The first amended complaint elsewhere alleges that the "known loss/loss-in-progress" doctrine bars coverage since the legal liability of the Fisher Entities "has been determined, is certain to occur, or the loss is already in progress." (*Id.* ¶ 75(5).)

to Thermo Fisher Scientific Inc. (Thermo Fisher) on March 15, 2019 (March 15 Letter) and March 28, 2019 (March 28 Letter) in response to Thermo Fisher's notice of claim. (*Id.* ¶¶ 68, 70.) The March 15 Letter concerned claims pertaining to perfluorooctanoic acid and perfluorooctanesulfonic acid at the Fair Lawn Well Field Site, which encompasses the Well Field, and "reserve[d] [AIG's] right to provide coverage for this matter subject to the Policy terms and conditions, [and] reservation of rights[.]" (*Id.* ¶¶ 18, 68.)

Similarly, the March 28 Letter concerned claims pertaining to 1,4-dioxane, but "acknowledged that those claims were covered by the Policy … subject to the Policy terms and conditions, [and] reservation of rights[.]" (*Id.* ¶ 70.) Subsequently, by two letters dated May 18, 2020, AIG "implicitly withdrew its acceptance of coverage of [Thermo Fisher]'s 1,4-dioxane claims[.]" (*Id.* ¶ 83.) The Fisher Entities allege that neither the March 15 Letter nor the March 28 Letter "reserved rights with respect to any of the Policy provisions raised in [AIG]'s Complaint initiating this litigation[.]" (*Id.* ¶ 72.)

The first amended counterclaim asserts the following causes of action: breach of contract (count one); breach of the implied covenant of good faith and fair dealing (count two); declaratory relief (count three); and equitable estoppel (count four). (*Id.* pp. 41, 43.) As a result of AIG's alleged bad faith, the Fisher Entities claim they have been "deprived of the benefits of insurance coverage[.]" (*Id.* ¶ 124.) The Fisher Entities specifically allege that AIG committed bad faith by: (a) unreasonably delaying its investigation, evaluation, and processing of the Fisher Entities' claims; (b) failing to reimburse the Fisher Entities for the covered loss while simultaneously failing to deny coverage; (c) wrongfully misinterpreting an "Other Insurance" provision in a Policy endorsement as a basis for delaying indemnification of the Fisher Entities' claims; (d) surreptitiously withdrawing acceptance of coverage; (e) initiating this lawsuit without providing an opportunity to respond to AIG's causes of action; and (f) misrepresenting the

4

Fisher Entities' disclosures to AIG during the Policy underwriting process to rescind the Policy. (*Id.* p. 42.)

## PROCEDURAL HISTORY

AIG filed the complaint against Thermo Fisher on September 22, 2020. (ECF No. 1.) Thermo Fisher filed an answer to the complaint—and, with Fisher Scientific, a counterclaim against AIG—on November 13, 2020. (ECF No. 23.) The Fisher Entities filed the first amended counterclaim against AIG on November 24, 2020. (ECF No. 30.) AIG filed the first amended complaint against the Fisher Entities on December 11, 2020 (ECF No. 32), along with its answer to the first amended counterclaim on December 18, 2020 (ECF No. 35). The Fisher Entities filed their answer to the first amended complaint—refiling their first amended counterclaims without further amendment—on December 28, 2020. (ECF No. 37.)

AIG filed the Application on January 19, 2021. (ECF No. 40.) The Application was extensively briefed (ECF Nos. 43, 47, 49) with supplemental letters filed by the Fisher Entities and AIG on March 24, 2021 and April 16, 2021, respectively.[5] (ECF Nos. 52, 53.) I conducted a hearing on the Application on March 15, 2021. (Minute entry after ECF No. 49.)

## PARTIES' ARGUMENTS

### I. AIG'S APPLICATION

AIG contends the factors that courts typically consider in deciding whether to sever a claim weigh in favor of severance. (ECF No. 40 pp. 2–4.) According to AIG, the bad faith claim is different from the contract-based and declaratory-

---

[5] The Fisher Entities' supplemental letter and addendum of March 24, 2021 purports to identify cases in which courts have found underwriting and claims-handling documents "to be relevant and discoverable in connection with coverage claims." (ECF No. 52 p. 1.) The addendum lists 33 cases, only seven of which apply New Jersey law. (*Id.* p. 3; ECF No. 53 p. 1). The cases listed are either distinguishable from, or inapposite to, this matter.

5

relief claims, and the bad faith claim will require different witnesses and documents.  (*Id.* p. 3.)  Further, if the bad faith claim is severed, the Fisher Entities would not be prejudiced because they have not prevailed on their coverage claims, and fact discovery remains open.  (*Id.* p. 3.)  Conversely, if the bad faith claim is not severed, AIG would be prejudiced in light of the additional costs associated with bad faith discovery.  (*Id.* pp. 3, 4.)  AIG adds that severing and staying the bad faith claim is not only in furtherance of judicial economy, but also the "prevailing practice" in federal and state courts.  (*Id.* pp. 2, 4.)

## II. THE FISHER ENTITIES' OPPOSITION

In opposition to the Application, the Fisher Entities submit that severing the bad faith claim from the coverage claims would neither prevent injustice nor promote judicial efficiency.  (ECF No. 43 p. 3.)  They also dispute that the severance factors weigh in favor of severing the bad faith claim.  (*Id.*)  First, the "similarity" between the bad faith claim and coverage claims "militates against severing and staying the bad faith counterclaim."  (*Id.* p. 5.)  According to the Fisher Entities, AIG "has placed its underwriting of the [P]olicy and typical underwriting practices at issue through its efforts to exclude coverage and rescind the [P]olicy … based on [the Fisher Entities'] alleged failure to disclose … during the … underwriting process."  (*Id.*)  Further, AIG's coverage defenses "raise multiple claims handling and underwriting issues that are 'intertwined' with, and not 'significantly different' from, [the Fisher Entities'] bad faith counterclaim."  (*Id.*)

Second, the Fisher Entities argue that AIG's coverage defenses "largely implicate" the same witnesses and documents "likely to be relevant to [the] bad faith counterclaim."  (*Id.* p. 6.)  They add that discovery on AIG's underwriting and claim files "will be warranted regardless of whether the bad faith counterclaim is severed."  (*Id.*)  Consequently, severance "would result in two rounds of discovery" as to "overlapping underwriting and claims-handling facts,

6

which would unnecessarily prolong the litigation." (*Id.*) They also submit that severing the bad faith counterclaim "is likely to create discovery disputes … over which discovery requests relate to which claims." (*Id.* p. 7.)

As to the relative prejudice to the parties under factors three and four, the Fisher Entities argue that severance would prejudice them because AIG has served a significant number of discovery requests, and staying discovery on the bad faith claim would "skew the discovery burden even further[.]" (*Id.* p. 8.) They claim that the number of requests shows that AIG "is determined to make litigating the coverage claims as time-consuming and burdensome" as possible and shows that AIG "does not envision that discovery on coverage matters can be swiftly conducted or narrowly directed[.]" (*Id.*) Conversely, AIG has not shown that it will be prejudiced if the request to sever is denied. (*Id.*) They point out that AIG "chose to file this lawsuit, and the only purported prejudice … is 'substantially more costs and fees[.]'" (*Id.*)

### III. AIG'S REPLY SUBMISSION

In response to the Fisher Entities' opposition, AIG disputes the Fisher Entities' application of the severance factors. (ECF No. 47 pp. 1–3.) AIG argues that the Fisher Entities must establish the existence of coverage as a precondition to pursuing a bad faith claim. (*Id.* p. 1 n. 1.) According to AIG, "the threshold coverage issues … are factually distinct from the *claims handling* issues [the] bad faith claim[] actually implicate[s]." (*Id.* p. 2 (emphasis in original).) AIG notes that the bad faith claim focuses on "all of the events that took place after [the Fisher Entities] reported the claim, which are irrelevant to whether coverage applies in the first instance." (*Id.*) It also reiterates that the coverage claims and bad faith claim will not require the same witnesses and documentary proof. (*Id.*)

AIG contends that the Fisher Entities would not be prejudiced by severance merely because staying bad faith discovery would produce a disparity between

7

the volume and scope of the parties' respective discovery demands. (*Id.* p.3.) AIG also indicates that severance would not preclude the Fisher Entities from seeking discovery on information it provided during the underwriting of the Policy that remains "potentially relevant" to AIG's rescission claim. (*Id.* p. 2.) By contrast, AIG submits that it would be prejudiced if its request to sever is denied because the time and expense associated with responding to bad faith related discovery and moving for summary judgment on the bad faith claim will significantly increase AIG's costs. (*Id.*) In addition, litigating the bad faith claim would prove unproductive if AIG prevails in showing the Fisher Entities are not entitled to coverage. (*Id.* p.3.)

## IV. THE FISHER ENTITIES' SUR-REPLY

In further opposition to the Application, the Fisher Entities submit that, because discovery on AIG's acceptance of coverage, delayed reservation of rights based on late notice, and typical practices with regard to late notice are relevant to the issue of notice in this matter, "[d]iscovery on these issues will necessarily overlap with discovery on [the] bad faith counterclaim[.]" (ECF No. 49 p.2.) As such, according to the Fisher Entities, AIG's "knowledge and behavior throughout the underwriting and claims-handling periods are relevant both to [the] coverage claims and [the] bad faith counterclaim." (*Id.* p.3.)

## APPLICABLE LAW

### I. STANDARD FOR SEVERING CLAIMS

Under Federal Rule of Civil Procedure (Rule) 21, "[o]n motion or on its own, the court may at any time, on just terms, add or drop a party … [and] may also sever any claim against a party." Fed.R.Civ.P. 21. "Severing claims under Rule 21 is appropriate where the claims to be severed are discrete and separate in that one claim is capable of resolution despite the outcome of the other claim." *Ames v. USAA Life Ins. Co.*, No. 18-09865, 2018 WL 5634684, at *1 (D.N.J. Oct.

8

31, 2018) (quoting *Turner Constr. Co. v. Brian Trematore Plumbing & Heating, Inc.*, No. 07-00666, 2009 WL 3233533, at *3 (D.N.J. Oct. 5, 2009)).

In deciding whether to sever a claim, courts consider the following factors: "(1) whether the issues sought to be tried separately are significantly different from one another, (2) whether the separable issues require the testimony of different witnesses and different documentary proof, (3) whether the party opposing the severance will be prejudiced if it is granted, and (4) whether the party requesting severance will be prejudiced if it is not granted." *Bayshore Recycling Corp. v. ACE Am. Ins. Co.*, No. 19-21618, 2020 WL 1986484, at *1 (D.N.J. Apr. 27, 2020) (citation omitted). "The decision to sever a claim or to try it separately is left to the discretion of the trial court." *Rodin Props.-Shore Mall, N.V. v. Cushman & Wakefield of Pa., Inc.*, 49 F.Supp.2d 709, 721 (D.N.J. Jan. 25, 1999) (citing *Walsh v. Miehle-Goss-Dexter, Inc.*, 378 F.2d 409, 412 (3d Cir. 1967)).

## II. BREACH OF CONTRACT AND BAD FAITH CLAIMS

"An insurance policy is a contract that will be enforced as written when its terms are clear in order that the expectations of the parties will be fulfilled." *Flomerfelt v. Cardiello*, 202 N.J. 432, 441 (2010) (citations omitted). In considering the meaning of an insurance policy, courts interpret the policy language "according to its plain and ordinary meaning." *Id.* (quoting *Voorhees v. Preferred Mut. Ins. Co.*, 128 N.J. 165, 175 (1992)). "[T]he determination of 'the proper coverage of an insurance contract is a question of law.'" *Causeway Auto., LLC v. Zurich Am. Ins. Co.*, No. 20-08393, 2021 WL 486917, at *3 (D.N.J. Feb. 10, 2021) (quoting *Buczek v. Cont'l Cas. Ins. Co.*, 378 F.3d 284, 288 (3d Cir. 2004)). While courts construe ambiguous terms against the insurer and in favor of the insured so that the insured's reasonable expectations are given effect, *Doto v. Russo*, 140 N.J. 544, 556 (1995), courts cannot "write for the insured a better policy of insurance than the one purchased." *Walker Rogge, Inc. v. Chelsea Title & Guar. Co.*, 116 N.J. 517, 529 (1989).

In New Jersey, "'an insurance company owes a duty of good faith to its insured in processing a first-party claim.'" *Onex Credit Partners, LLC v. Atrium 5 Ltd.*, 2014 WL 4798758, at *6 (D.N.J. Sept. 26, 2014) (quoting *Pickett v. Lloyd's*, 131 N.J. 457, 467 (1993)). A violation of the implied covenant of good faith and fair dealing, also known as a bad faith claim, "focuses on the conduct of the insurer in its review and processing of a claim under an existing policy." *J. Fletcher Creamer & Son, Inc. v. Hiscox Ins. Co. Inc.*, No. 19-21638, 2020 WL 2899499, at *3 (D.N.J. June 2, 2020) (citing *Laing v. Am. Strategic Ins. Corp.*, No. 14-01103, 2014 WL 4953250, at *2 (D.N.J. Oct. 1, 2014)). "Neither negligence nor mistake is sufficient to show bad faith." *Onex Credit Partners*, 2014 WL 4798758, at *9. A bad faith claim "requires 'the absence of a reasonable basis for denying benefits of the policy and the defendant's knowledge or reckless disregard of the lack of a reasonable basis for denying the claim.'" *Port Liberte Homeowners Ass'n, Inc. v. Lexington Ins. Co.*, No. 16-07934, 2017 WL 1528697, at *1 (D.N.J. Apr. 25, 2017) (quoting *Pickett*, 131 N.J. at 473). "If there is a valid question of coverage, i.e., the claim is 'fairly debatable,' the insurer bears no liability for bad faith." *Wacker-Ciocco v. Gov't Emps. Ins. Co.*, 439 N.J. Super. 603, 611 (App. Div. 2015) (citing *Pickett*, 131 N.J. at 473–74).

"Given that the 'fairly debatable' standard necessitates a ruling on coverage prior to the adjudication of a bad faith claim, … it is '[n]o surprise, then, that severance and stay of bad faith claims has been called the 'prevailing practice' in both the state and federal courts of New Jersey.'" *J. Fletcher Creamer*, 2020 WL 2899499, at *4 (quoting *Port Liberte Homeowners Ass'n, Inc.*, at *2, and collecting cases). Whereas "'breach of insurance contract claims concern policy coverage[,]'" claims for bad faith "'concern the insurer's general claims handling procedures, its claims conduct in the case at issue, and its knowledge and state of mind about the grounds for denial of coverage.'" *Bayshore Recycling*, 2020 WL 1986484, at *2 (quoting *Spectrum Data Sys., LLC v. State Farm Ins. Co.*, No. 18-10318, 2019 WL 259605, at *2 (D.N.J. Jan. 18, 2019)).

10

"Because discovery on a bad faith claim would be rendered needless if the insurer prevails on the coverage claim, 'proof [that] an insured is entitled to coverage as a matter of law is a necessary prerequisite to pursuing discovery regarding a bad faith claim.'" *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Becton, Dickinson & Co.*, No. 14-04318, 2018 WL 627378, at *2 (D.N.J. Jan. 30, 2018) (quoting *Wacker-Ciocco*, 439 N.J. Super. at 614). In other words, "the insured who alleges bad faith by the insurer must establish the merits of his or her claim for benefits." *Wacker-Ciocco*, 439 N.J. Super. at 611.

## **DECISION**

Having considered the parties' respective positions raised in the Application and related submissions, I find that the Fisher Entities' bad faith claim should be severed, and discovery related to bad faith should be stayed. On balance, the severance-factors weigh in favor of granting the Application.

As to the first factor, issues pertaining to the coverage claims asserted by the parties are significantly different from the Fisher Entities' bad faith claim. Generally, coverage disputes concerning the enforcement of policy terms according to their plain meaning are distinguishable from bad faith liability "focuse[d] on the conduct of the insurer in its review and processing of a claim under an existing policy" *J. Fletcher Creamer*, 2020 WL 2899499, at *3 (citation omitted). In this case, the Fisher Entities' bad faith claim is likewise distinguishable from its other claims. In addition to the bad faith claim, the first amended counterclaim asserts causes of action for breach of contract, declaratory relief, and equitable estoppel, all of which relate to Policy coverage for the Remediation Costs. (ECF No. 37 pp. 41–45.) The Fisher Entities' bad faith claim is premised on alleged claims conduct on the part of AIG, all of which occurred after the Fisher Entities submitted the relevant claims to it. (*Id.* p. 42.) In this regard, the fact allegations supporting the bad faith claim differ from those underpinning the coverage claims.

11

The Fisher Entities' contention that the coverage claims and bad faith claim are "similar" merely because AIG "has placed its underwriting of the [P]olicy … at issue" for the Fisher Entities' purported failure to make certain disclosures during Policy underwriting is unpersuasive. (ECF No. 43 p. 5.) The facts and circumstances related to AIG's underwriting of the Policy pre-date the Fisher Entities' submission of the claims to AIG, and are distinct from "the insurer's general claims handling procedures, its claims conduct in the case at issue, and its knowledge and state of mind about the grounds for denial of coverage.'" *Bayshore Recycling*, 2020 WL 1986484, at *2. Accordingly, the claims are significantly different for purposes of severance analysis. Because "[s]evering claims under Rule 21 is appropriate where the claims to be severed are discrete and separate[,]" *Ames*, 2018 WL 5634684, at *1, I find that the first factor weighs in favor of severing the bad faith claim and staying bad faith discovery.

As to the second factor, the coverage claims and bad faith claim will likely involve different witnesses and different documents. Whereas the coverage claims will be determined by examining the terms and conditions of the Policy, the bad faith claim will depend on documents and communications related to AIG's claims conduct. Documents relevant to the coverage disputes will almost certainly include the Policy itself, the Fisher Entities' Policy application, and related documents. On the other hand, documents relevant to the bad faith claim will likely encompass the documents and communications related to AIG's handling of the subject claims along with general claims procedures. Such documents would include, for instance, the March 15 Letter, March 28 Letter, and AIG's letters of May 18, 2020 "implicitly withdr[awing] its acceptance of coverage" (ECF No. 37 ¶ 83), which is a facet of the Fisher Entities' bad faith claim (*id.* p. 42). Thus, while there may be some limited overlap, the documents related to the coverage claims will likely differ from those related to the bad faith claim. *See J. Fletcher Creamer*, 2020 WL 2899499, at *5 ("The Court agrees with

the overwhelming majority of courts that bad faith claims regularly demand different witnesses and documentary proof from the breach of contract claims.").

Further, the bad faith claim will likely involve different witnesses. AIG's initial disclosures pursuant to Rule 26(a)(1) identify "individuals likely to have discoverable information … that [AIG] may use to support [AIG's] claims or defenses[.]" (ECF No. 43-1 p.2.) Among the five individuals identified, two persons have knowledge as to the Policy, its terms, the subject claims at issue, AIG's communications with Thermo Fisher about coverage, and AIG's coverage positions. (*Id.* p.3.) Insofar as the other three persons identified possess knowledge only as to AIG's underwriting of the Policy and past information for the Policy application process Thermo Fisher provided, the coverage claims and bad faith claim will almost certainly involve different witnesses. Merely that two persons identified in AIG's disclosures might also have knowledge about the claims at issue does not mean the coverage claims will involve the same witnesses as the bad faith claim. Because the coverage claims and bad faith claim will most likely require different testimony and proofs, I perceive no basis to depart from the "prevailing practice" of severing the bad faith claim. I find that the second factor weighs in favor of severing the bad faith claim and staying bad faith discovery.

As to the third and fourth factors, which turn on the relative prejudice to the parties, I find that the prejudice to AIG if the Application were denied would outweigh the prejudice to the Fisher Entities if the Application were granted. Initially, I can only surmise as to when, and how, the Court will determine the coverage issues in this matter. But insofar as the threshold coverage question is determinative of any bad faith liability, *Pickett*, 131 N.J. at 473–74, permitting bad faith discovery now would seem premature, unproductive, and potentially wasteful. Practically, "if there is no coverage, then denial of a claim cannot have been in bad faith, so discovery and litigation on the bad faith issue will have been wasted." *Port Liberte Homeowners Ass'n, Inc.*, 2017 WL 1528697, at *2.

"Because discovery on a bad faith claim would be rendered needless if the insurer prevails on the coverage claim, 'proof [that] an insured is entitled to coverage as a matter of law is a necessary prerequisite to pursuing discovery regarding a bad faith claim.'" *Nat'l Union*, 2018 WL 627378, at *2 (quoting *Wacker-Ciocco*, 439 N.J. Super. at 614).

Here, permitting the parties to engage in bad faith discovery might be "rendered needless" and, as such, would be potentially wasteful of the parties' time and resources. If AIG prevails on its coverage position, neither party will have needed to conduct any discovery on bad faith issues. AIG could suffer prejudice by testing bad faith allegations when no bad faith claim emerges beyond the coverage determination. Alternatively, if the Fisher Entities prevail on *their* coverage position, thereby opening the door to bad faith liability as to AIG, bad faith discovery would then be permitted. There is little if any prejudice to the Fisher Entities to shelve bad faith discovery for the time being. Thus, in the interest of efficiency and judicial economy, the third and fourth factors weigh in favor of severance of the bad faith claim and stay of bad faith discovery.

The Fisher Entities advance a few additional arguments that warrant discussion. First, they submit that severing the bad faith claim will likely create discovery disputes over which discovery requests relate to which claims. (ECF No. 43 p.7.) But the Fisher Entities' prediction in this regard is just that: a prediction. Whether such disputes will actually arise remains to be seen. Second, it does not appear AIG has taken an obstructionist approach to discovery in this matter. For example, at the hearing of March 15, 2021, AIG's counsel represented that "[a]nything related to the handling of this claim, our claims handling file, our underwriting file in this [P]olicy, we have no issue with [producing]." (ECF No. 51 19:14–16.) AIG only seeks to limit "onerous discovery" that "has nothing to do with" the relevant claim and the subject Policy at issue in this matter. (*Id.* 20:1–3.) Thus, a deluge of disputes over which

requests might delve into the realm of bad faith would seem unlikely.[6]  Should such disputes arise, they will be addressed and resolved in due course.

The Fisher Entities also argue that because discovery on AIG's underwriting and claim files is "inevitable," such discovery should proceed in any case. (ECF No. 43 p. 6.) They also claim that, because discovery related to the late notice of the subject claims to AIG "will necessarily overlap with discovery" on the bad faith claim (ECF No. 49 p. 2), severance and the requested stay should be denied.

However, discovery on AIG's claim files may not be "inevitable" unless and until a coverage determination is made. And AIG has indicated that severing the bad faith claim would not prevent the Fisher Entities from seeking discovery on information it provided during the underwriting of the Policy that is "potentially relevant" to AIG's rescission claim. (ECF No. 47 p. 2.) Further, even if discovery on AIG's underwriting, AIG's claim files, or certain notice issues happens to overlap with discovery exchanged on coverage issues, such potential overlap does not warrant denial of the Application. AIG would seem to take no issue with providing such discovery so long as it relates to the relevant claims and the subject Policy, coverage under which, presently, remains disputed and unresolved.

## CONCLUSION

For the reasons stated, the Application (ECF No. 40) is **GRANTED**. A separate Order accompanies this Opinion.

                                   _/s/ Edward S. Kiel_
                                   **EDWARD S. KIEL**
                                   **UNITED STATES MAGISTRATE JUDGE**

Date: June 29, 2021

---

[6] The stay of bad faith discovery may be lifted. See *Nat'l Union*, 2018 WL 627378, at *6 (*sua sponte* vacating prior stay of bad faith discovery where "continuation of the present stay will result in countless more disputes over the contours of Defendant's discovery requests and whether such requests may in some way cross the border in the bad faith arena").